## O'CONNELL *v.* SCHMIDT.

---

PATENTS; INTERFERENCE; FINDINGS OF FACT BY PATENT OFFICE; REDUCTION TO PRACTICE; DILIGENCE; DATES.

1. The rule that this court will not, except in extraordinary cases, disturb the findings of fact of the Patent Office, does not mean that the court is bound by the conclusions drawn from such facts, unless convinced that such conclusions are correct.
2. Unless an invention belongs to that class of simple inventions which require no other proof of their practicability than the construction of a model, the mere construction of a model does not constitute a reduction to practice, even if such model is clearly sufficient to disclose the invention, and to enable those skilled in the art to understand it thoroughly.
3. The inventor who is first to conceive and disclose is entitled to priority, provided he has used reasonable diligence in adapting and perfecting his invention, even though his adversary is the first to reduce to practice, actually or constructively.
4. An inventor who is the first to conceive and disclose is under no obligation of diligence until just prior to the date when his rival enters the field.
5. There is no general rule as to what constitutes due diligence in reducing to practice, that being a question to be determined by all the facts and surrounding circumstances in the particular case.

6. The burden is upon the party questioning the correctness of the date given as the date of the oath to an application for a patent.

7. Where an inventor has conceived the idea, and has embodied it in models,. which, if tested, would amount to a reduction to practice, and has disclosed the invention to experts in the art, and, at the time his rival enters the field, is urging the acceptance of the invention in the trade; and where he files his application only six months later than his rival,—he is exercising due diligence, and is entitled to priority.. (Distinguishing *Watson* v. *Thomas*, 23 App. D. C. 65.)

8. The fact that an inventor, who is the first to conceive, has made models. which, if tested, would constitute a reduction to practice, and has shown these models to those skilled in the art, thus fully disclosing the invention and its practicability, should have considerable weight in determining the question of diligence. (Following *Hammond* v. *Basch*, 24 App. D. C. 469.)

No. 304. Patent Appeals. Submitted November 15, 1905. Decided February 14, 1906.

HEARING on an appeal from a decision of the Commissioner of Patents in an interference case.                    *Reversed.*

The facts are sufficiently stated in the opinion.

*Mr. George P. Barton, Mr. De Witt C. Tanner,* and *Mr. George E. Folk* for the appellant.

*Mr. Charles C. Linthicum* and *Mr. Albert H. Graves* for the appellee.

Mr. Justice DUELL delivered the opinion of the Court:

In this case, which is an appeal from the decision of the Commissioner of Patents awarding priority of invention to the senior party, Louis A. Schmidt, it appears that the three Patent Office tribunals have been in accord, and consequently the case falls within the decisions of this court that, except in extraordinary cases, we will not disturb the findings of fact of the Patent Office. This, however, does not mean that we are bound by the conclusions drawn from such facts, unless we are convinced that such conclusions are correct. The lower tribunals may agree

that certain facts do not prove a reduction to practice or due diligence. This tribunal, while accepting the facts, may be convinced that the conclusion is erroneous, and therefore, for that reason, be compelled to reverse the judgment appealed from.

The nature of the invention in controversy is sufficiently disclosed by the counts of the issue, which read:

"1. The combination with a traveling transmitter mechanism, of a counting train comprising rotatable cylinders having teeth adapted to be introduced successively into the path of said transmitting mechanism and co-operating therewith, and a circuit including a responsive device controlled by said transmitter mechanism, whereby the number registered upon the train of counting cylinders is transmitted to said responsive device."

"3. The combination, in a connection register, of a movable part, and means for effecting a progressive displacement of said part in the act of registration, a transmitting arm adapted to co-operate with the movable part to measure its displacement without changing the same, and a circuit including a responsive device controlled by said transmitting arm whereby the register may be read from a distance without destroying its record.

"4. The combination with a subscriber's telephone line, of a connection register at the substation thereof, a responsive device in the circuit of the line at the central office, a transmitting mechanism at the substation, a movable part for the aforesaid connection register, adapted to co-operate with the transmitting mechanism in controlling the circuit of the line, means for effecting a progressive displacement of said part in the act of registering a connection, and means for producing a relative movement of said movable part and the transmitting mechanism to measure said displacement without altering the same, whereby the connection register may be read from the central office without destroying its record.

"5. In combination, a series of tally wheels each provided with a circumferential series of contact surfaces representing characters, a traverser relatively movable across said wheels, an

electric circuit including said traverser, means operating to make and break said circuit each time said traverser passes over one of said contact surfaces, means for stepping the tally wheels forward, and means for actuating the traverser.

"6. In combination, a series of tally wheels each provided with a circumferentially disposed series of contact surfaces corresponding to the digits and arranged in groups each group extending longitudinally of the series of wheels, transfer mechanism for properly actuating each tally wheel except the first from the next of lower order, a ratchet mechanism for stepping forward the units tally wheel, an electrical signaling device operatively connected with said ratchet mechanism, and whereby a signal is given each time the ratchet mechanism is operated, a traversing contact device guided to reciprocate across the face of said series of tally wheels to take a tactual reading from the contact surfaces thereof, and an electric circuit operatively connected with said traversing device, and alternately opened and closed during the traverse of the latter a number of times, equal to the number of units in the several groups in longitudinal alignment at the time of reading.

"7. In combination, a plurality of interconnected carrying counters, means for actuating the same to tally thereon, each counter provided with groups of contact surfaces representing numerals, means for taking a tactual reading from said counters, and means to transmit said reading electrically to a distance."

The facts as found by the three tribunals of the Patent Office, which we accept when taken in connection with other facts not inconsistent with them, show: First, that Schmidt, the senior party, does not show any earlier date of conception than February 10, 1902, the date of the filing of his application. Second, that Joseph J. O'Connell, the junior party, caused to be constructed two models, known respectively as the "Messinger" and "Tuerk" models; that the former was made early in November, 1901, and the latter completed November 27, 1901; that these models were not operative devices; that, by means of these models, the invention in controversy was explained during the same month to others skilled in the art, who, by such disclosure,

thoroughly understood the invention; that the invention was offered that month to the Western Electric Company; that whenever O'Connell came to Mr. McBerty's office he urged that the invention be accepted, and that in April or May, 1902, he became so insistent that McBerty, some time prior to June, 1902, ordered the application prepared; that it was prepared by means of the Tuerk model, and executed and sworn to June 19, 1902, and on the same day assigned to the Western Electric Company; and that the application was filed and the assignment recorded July 19, 1902.

From these facts the Patent Office tribunals found Schmidt to be entitled to a date of conception and constructive reduction to practice as of his filing date, February 10, 1902. This finding is correct and is based upon repeated decisions of the Patent Office and of this court.

It was further found by them that O'Connell was entitled to a date of conception and disclosure as of the latter part of November, 1901, but that he was not entitled to any earlier date of reduction to practice than that of the filing date of his application, which was July 19, 1902. While the models were clearly sufficient to disclose the invention, and enabled those skilled in the art thoroughly to understand it, and to prepare an application for a patent, and though indicating no circuits of operation, their intended use in such circuits was understood,—in brief, sufficient to enable the utilization of the invention so that, had death removed the inventor before an application for patent had been filed, the invention would have survived,—we do not think, under all the circumstances, and in the absence of any test, that they can be treated as a reduction to practice. The invention does not belong to that class of simple inventions which require no other proof of their practicability than the construction of a model. We agree, therefore, with the Patent Office tribunals in their conclusion that they did not constitute an actual reduction to practice, and therefore there is no proof of any earlier reduction to practice than July 19, 1902, the date when O'Connell filed his application for patent.

This brings us to the serious question in the case. O'Connell,

being the first to conceive and disclose, is entitled to the patent
over Schmidt, provided he used reasonable diligence in adapting
and perfecting his invention.   It is unnecessary to cite authori-
ties in support of this proposition, so often has it been approved.
This is so even though Schmidt had actually or constructively
reduced it to practice before him.   O'Connell, having first con-
ceived and disclosed the invention, was under no obligation of
diligence until just prior to the date when his rival entered the
field.   The time to be considered is five months and ten days.
There is no hard and fast rule by which to determine the ques-
tion of due diligence.   In other words "there is no general rule
of what constitutes due diligence, that being a question to be
determined by all the facts and surrounding circumstances in
the particular case."   Let us examine the facts and circum-
stances in the case before us.   O'Connell had conceived the idea,
and had embodied it in models which almost amounted to a re-
duction to practice, and which, had the second one been connect-
ed up and tested, would have amounted to a reduction to prac-
tice.   He had placed the invention before those who, under
certain conditions, were entitled to patent it.   At the time when
his rival entered the field he was urging that the invention be ac-
cepted and patented.   That was in February, 1902.   In April
or May of the same year, O'Connell becoming more persistent,
the application was, at some time prior to June 19, 1902, pre-
pared, and on that day the oath to the application was executed
by him and the application assigned to the Western Electric
Company.   There is nothing to show that the date of the oath
is not correctly and truthfully given.   The burden is upon the
party questioning the correctness of the date to show it.   *Barry*
v. *Hoffman,* 6 Md. 78; *Pringle* v. *Dunn,* 37 Wis. 449, 19 Am.
Rep. 772; *Barnett* v. *Proskauer,* 62 Ala. 486; *Baldwin* v. *Born-
heimer,* 48 Cal. 433.   The application, however, was not filed
until a month later.   At the most O'Connell's delay after
Schmidt entered the field was only a few days over five months,
and a month less in having an application for patent prepared
and executed, and that application was directed to be prepared
a considerable time before.   During the intervening time

O'Connell might, it is true, have had his working model tested, but that would not, according to his witnesses, experts in the art, have given them any more knowledge of the invention. We know of no rule which, under the circumstances of this case, requires an inventor to rush to the Patent Office in order to preserve his rights as the first inventor. While giving to Schmidt the full benefit of the first reduction to practice, we must remember that such reduction was constructive, and not actual. In cases where the facts are as here shown the courts should be slow to deprive the one who first conceives the idea, and so fully discloses it as did this appellant, of a patent because one later to conceive and disclose files his application for patent a short time before him, and while he shows so conclusively that he is is not concealing his invention, nor intending to abandon it.

The facts in the cases cited by the lower tribunals, and relied upon in support of their contention that appellant was not duly diligent, are quite different from those in the case at bar. In *Kasson* v. *Hetherington,* C. D. 1899, p. 143, Kasson, who conceived in May, 1894, did nothing from October, 1894, to the time when he filed his application, March 30, 1896,—a delay of about eighteen months. His adversary entered the field in September, 1894, and had issued to him a patent in June, 1895, more than nine months before Kasson's application was filed.

In *Watson* v. *Thomas,* 23 App. D. C. 65, it appears that Thomas, the senior party, relied upon his record date, which was December 17, 1896. Watson, the junior party, conceived the invention eleven months before Thomas filed his application, but his reduction to practice was thirteen months after his conception. Furthermore, Kasson and Thomas, at the time when their rivals entered the field, had only made sketches and drawings, while in the case at bar O'Connell had made devices which, had they been placed in circuits and operated, would have constituted a reduction to practice. They were further shown to those skilled in the art, and by means thereof the invention and its practicability fully disclosed. These facts should have considerable weight in determining the question of diligence. *Hammond* v. *Basch,* 24 App. D. C. 469.

Under all the circumstances of the case, we think it would be unjust,· and not warranted by law, to deprive O'Connell of his invention, and to award a patent to one who is not the first inventor. We consider that appellant is entitled to an award of priority of invention.

It follows that the decision of the Commissioner of Patents was erroneous, and we therefore reverse his decision.

The clerk of the court will certify this opinion, and the proceedings in this court in the premises, to the Commissioner of Patents according to law. *Reversed.*