37 C.C.P.A. (Patents)

## PAYNE v. MOORE.

### No. 5637.

United States Court of Customs and
Patent Appeals

April 3, 1950.

Norman H. Gerlach, Chicago, Ill. (Miles D. Pillars, Washington, D. C., of counsel), for appellant.

Christy, Parmelee & Strickland, Pittsburgh, Pa. (Wm. H. Parmelee, L. Clyde Strickland, Pittsburgh, Pa., and Lee L. Townshend, Washington, D. C., of counsel), for appellee.

GARRETT, Chief Judge.

Appellant, hereinafter referred to as Payne, seeks reversal of the decision of the Board of Interference Examiners awarding priority to appellee, hereinafter referred to as Moore, in an interference proceeding (No. 81,602) involving six counts which relate to a particular type electric arc furnace used for melting metal in foundry furnaces.

Counts 3 and 5 were quoted by the board as being "sufficiently illustrative." They read:

"3. An electric arc furnace comprising a vertically movable mounting, an electrode carried by the mounting and provided with means for supplying it with electric power input, a liquid column and confining means therefor positioned to support the mounting, a reversible rotary metering pump disposed between, and connected to, a confined liquid source and adapted when driven in one direction to supply liquid from the source to the column in order to augment the latter and effect raising of the mounting and electrode and when driven in the opposite direction to remove liquid from the column and thereby effect lowering of said mounting and electrode, means

for driving the pump in either direction, controlled automatically in response to variations in said electric power input, and means in the form of a confined body of gas under pressure on the surface of the liquid source, for imparting a substantially constant thrust to the column in opposition to the weight of the mounting and electrode."

"5. An electric arc melting furnace comprising an electrode and mounting therefor, a confined liquid column positioned to support said electrode and mounting, means for imparting to the column a lifting force of such magnitude as substantially to counterbalance the weight of the electrode and mounting, and a liquid metering pump means for adding liquid to said column to raise the electrode and mounting and to remove liquid from said column to lower said electrode and mounting, said means being electrically responsive to variations in the arcing gap of the electrode."

The following explanation is taken from the board's decision:

"The subject matter here in issue pertains to a regulator for controlling the movements of an electrode in an electric arc furnace. The electrode and its support are mounted on a piston for vertical sliding movement. The piston is mounted in a cylinder the lower end of which is connected to a reversible motor-driven metering pump. The other side of the reversible pump is connected to a closed reservoir containing a body of oil under pneumatic pressure. The electrode is progressively controlled or shifted so that the lower end thereof is maintained at a predetermined distance from the charge of metal in the furnace by an electric control for the reversible pump motor responsive to the current supply to the electrode.

\*  \*  \*  \*  \*  \*

"It is to be noted that each of the six counts is limited to the *raising* of the electrode when oil is *added* or *supplied* to the cylinder and to the *lowering* of the electrode when oil is *withdrawn* from the cylinder. Systems in which the piston is supported by air under pressure and the electrode is *moved downwardly* when oil is

supplied to the top of the cylinder and the electrode moves *upwardly* when oil is withdrawn do not fall within the terms of the present counts. The system in issue is termed an 'air-on-oil' system in contradistinction to 'air-under-oil' systems." (Italics quoted)

Moore is the senior party, his application having been filed August 12, 1943; that of Payne was filed September 16, 1943.

The board awarded Moore June 28, 1943, for conception and his filing date, August 12, 1943, for constructive reduction to practice. Payne was awarded conception as of March 8, 1941, and his filing date of September 16, 1943, for constructive reduction to practice. Under the awards so made the vital issue, so far as the board was concerned, involved the question of Payne's diligence during the period from just prior to Moore's conception date of June 28, 1943, until Payne's filing date of September 16, 1943. Upon this question the board held that certain testing or demonstrating activities of Payne on June 11, 12, and 13, 1943, at meetings referred to as "open house" (which activities are hereinafter more fully discussed) were "sufficient to constitute diligence for this period," but held, in effect, that no activity by Payne, after June 13 up to Moore's filing date of August 12, 1943, which constituted diligence, had been shown.

In the reasons of appeal accompanying Payne's appeal to us there are assignments of error concerning such questions as Payne's alleged reduction to practice, the right of Moore to make certain of the counts, the date of Moore's conception, and the operativeness of one of Moore's disclosures, but in the brief on Payne's behalf the only alleged errors relied upon are those relating specifically to the question of his diligence, in connection with which there is an allegation that the board erred in failing to consider the testimony of one of Payne's witnesses by the name of James R. Hewitt who appeared during the taking of the rebuttal testimony on Payne's behalf.

The issue being thus limited, much of the testimony and other evidence in the

voluminous record becomes immaterial and irrelevant and requires no review here. It, however, has received our careful consideration in the effort to obtain the correct perspective of the issue actually before us.

■ No cross appeal was taken by the party Moore, but in his brief before us it is urged that according Payne a date of conception of March 8, 1941, was against the weight of the evidence. Assuming, without holding, that Moore as appellee may have the right to raise the question so posed without having taken a cross appeal, we do not think his contention is well founded.

Payne's drawing, Exhibit 10, of a one-half-ton-per-hour size electric furnace, which was built as a model at the plant of J. R. Hooper in Brookfield, Illinois, was held by the board to support the counts in issue. We think it does. It appears that the particular drawing filed in evidence may not have been made until some time after March 8, 1941, but the testimony of Mr. Hooper is deemed to substantiate the finding that a device known as "operating unit 1" embodying the arrangement shown in Exhibit 10 was tested on or near that date at the Hooper plant. The unit was carried to premises at 9 South Clinton Street, Chicago, Illinois, in the spring of 1941 and used as a demonstrator. Later it was dismantled and in September 1942 moved to Payne's establishment at La Grange, Illinois. In the Spring of 1943 a 3-ton-per-hour furnace was constructed. It is known in the record as "operating unit 2."

The "open house" meetings hereinbefore referred to as having been held at the instance of Payne on June 11, 12, and 13 were had, according to the brief for Payne, for the purpose of demonstrating the principle of an "air-under-oil" system and also that of an "air-on-oil" system (the latter being the system here in issue) "to outside arc furnace operators." For such demonstrations operating unit 2 was used.

According to the testimony of Payne, who referred to entries in his notebook, the "air-under-oil" arrangement was demonstrated Friday, June 11, and the "air-on-oil" arrangement Saturday, June 12. The only persons named by Payne as being present on June 12 were a Mr. Bert Aamodt, who was connected with National Malleable Steel Castings Company, and a Mr. Charles W. Vokac, who, while employed by Payne, constructed operating unit 2. Neither Aamodt nor Vokac seems to have been able to state positively just what the "hookup" was on June 12, but Vokac was present on all three days and testified, in effect, that the unit being used in the demonstrations was "hooked up" each way (that is, for "air-under-oil" pressure and "air-on-oil" pressure) at some time during the demonstrations.

Payne's testimony as to the demonstration on Sunday, June 13, indicates that there was probably more interest in golf on that day than there was in the demonstration. The following is his direct testimony covering that day:

"Q. 330. According to your time book for 1943, what transpired on Sunday, June 13th? A. We again held open house but did not stay around the plant very long as we had arranged to play golf at the Edgewood Valley Country Club. I had a party of eight visitors in that morning, according to my time book, Exhibit No. 25, five of whom went with me to the Edgewood Valley Country Club for a day playing golf and dinner.

"Q. 331. Who were present on June 13, 1943? A. The record in Exhibit 25 shows that those persons were myself and Jim Hewitt, then vice president of the American Manganese Steel Company, and his chief engineer, Brown Reinhardt, and George Sundheim from La Grange, and Charlie Vokac, and John McBroom. Two other friends played at our country club by the names of Larry Pridmore and Harold Pridmore, who were friends of our visitors.

"Q. 332. Did those visitors that you had on June 13, 1943 go to your La Grange plant and see the operating unit No. 2? A. That is right, before we went to the country club.

"Q. 333. How was the operating unit No. 2 hooked up on June 13, 1943? A. I

have no record of having changed it back to the original method.

"Q. 334. By the original method, what do you mean, as it was on the preceding day? A. I have no record of having changed it back to the original method of air on the bottom.

"Q. 335. As far as you know, the demonstrator unit on that day, June 13, 1943, was hooked up like it was on the day before? A. Yes."

The only persons named as being present on June 13 who testified in the case were Vokac and Hewitt. Sufficient allusion has been made to the testimony of Vokac.

As for that of Hewitt, he was not introduced as a witness until Payne's rebuttal evidence was being presented, and his testimony was refused consideration by the board because not proper rebuttal testimony. We think there was no error in this action of the board. We find nothing in his testimony which seems to us to rebut any of the material evidence introduced on behalf of Moore.

■ However, while it must be conceded that the testimony to the effect that there was a demonstration of an "air-on-oil" system at some time during the three days named is meagre, we can find no justification in the record for reversing the board's finding in that regard—a finding which relates only to the question of diligence.

We agree with the board that Payne has not proved any activity between June 13, 1943, and Moore's filing date of August 12, 1943, which constituted diligence in reducing the invention to practice, and we are of opinion that no sufficient excuse is given by him for his failure to do so.

The record discloses that Payne has received a number of patents in the furnace electrode field. Among those issued to him was one numbered 2,258,468, dated October 7, 1941, based on an application (serial No. 336,107) filed May 20, 1940. He testified that he delayed filing his application here involved because he was told by the attorney who prosecuted the application which eventuated in his patent 2,-258,468 that claim No. 1 of that patent gave him "full protection from anyone using air for counterbalancing electric arc furnace electrodes."

■■ The board held that Payne's testimony respecting what he was told by his attorney lacked corroboration, but, independently of that, held: "* * * The fact that he may have had a patent that gave him such protection does not excuse an inventor from exercising due diligence."

It is supposed that it was the intention of the board to apply the quoted ruling to Payne's situation in the instant case. We think it is applicable.

It may be that Payne has a patent which protects him with respect to the invention here involved, but that question is not before us for determination. This is an interference proceeding, and the only question before us for determination is that of priority. During the proceedings in the Patent Office, a question was raised as to certain of the counts being patentable to Moore, but, as has been stated, there is no contention to that effect before us. So, the matter of patentability to Moore is not involved as a question ancillary to priority.

That Payne himself concluded not to rely upon his patent for full protection seems evidenced by the fact that he finally determined to file his application here involved. We quote the following from his testimony:

"Q. 460. What prompted you to file the application when you did? A. We were in the process of studying these things, and when I heard at Chicago Heights through—

"Q. 461. What do you mean, you heard? A. And when I was told by Brown Reinhardt at Chicago Heights, an official of the American Manganese Steel Company, that they had been sworn to secrecy by Pittsburgh Lectromelt Furnace Corporation because they were applying, because Pittsburgh Lectromelt Furnace Corporation was applying for a patent on the system under interference, I immediately rushed to my attorney to see if I could not cover first.

"Q. 462. When you refer to Pittsburgh Lectromelt, do you mean Mr. Moore? A. That is right."

The only activity upon which Payne seems to rely for establishing diligence after June 13, 1943, up until the time when, to use his own expression, he "rushed" to his attorney, is that of proposals submitted by him or his company, Hydro-Arc Furnace Corporation, for the installation of electric arc furnaces.

Three proposals for furnaces of different sizes made to American Manganese Steel Company under date of July 31, 1943, are emphasized in the brief for Payne from which we quote the following:

"* * * All three proposals or bids of Payne's company, Hydro-Arc Furnace Corporation, were *intentionally couched in such language that the company could supply the furnace with either the 'oil over air' principle or the 'air on oil' principle.* [Italics supplied here] Concerning this matter Payne said * * * :

"Q. 379. Referring to Exhibits 37, 37A and 37B, I direct your attention to the paragraphs entitled, "Hydraulic Electrode Positioning Units," and request you to explain them. A. The hydraulic electrode positioning units specified in all three of these proposals, that is to say I should say they were recited in all three of these proposals so they could be operated either way, that is, with counterbalancing by the up-push on the bottom or counterbalancing air on oil to feed the intake of the arc actuated electric motors and pumps."

"The orders for the furnaces were ultimately placed with Moore's company, Pittsburgh Lectromelt Furnace Corporation, in the spring of 1944. Had Payne's company received the order the furnaces would have been built with the "air on oil" principle. This is definitely established by Payne who said * * * :

"Q. 373. Do you recall whether or not you discussed with them the air counterbalancing arrangement as depicted in Exhibit 28 as well as that depicted in your patent No. 2,296,734? A. I discussed both of these arrangements with these engineers because we were then in the process of changing over to the new arrangement.

"Q. 374. Changing over from what? A. Changing over from air up-push to air on oil counterbalancing, and we would have built the American Manganese jobs that way if we had received the order."

■ It would seem to be a fair assumption that if Payne received the contract, he would have been governed as to the system by the selection made by the party to whom the proposals were made. He was seeking business, and the proposal was such as to leave the choice to the party accepting the proposal. We think there was no error in the board's holding reading:

"* * * efforts toward commercial exploitation of an invention not yet reduced to practice do not in and of themselves constitute diligence."

The court decision chiefly relied upon by Payne is that of the Court of Appeals of the District of Columbia in the case of O'Connell v. Schmidt, 27 App.D.C. 77, 1906 C.D. 662.

That decision was not referred to by the board in the instant case, and we have not found where the board's attention was directed to it.

We have studied the case carefully. O'Connell was the junior party. Schmidt was awarded his filing date of February 10, 1902, for conception and reduction to practice. O'Connell was found to have conceived the invention in November 1901 and to have disclosed it in two models, the last of which was completed November 27, 1901, but not being tested it was held that the models could not be treated as a reduction to practice. The O'Connell application was filed July 19, 1902. So, the case turned on the question of O'Connell's diligence. Concerning this the court said, *inter alia:*

"This brings us to the serious question in the case. O'Connell, being the first to conceive and disclose, is entitled to the patent over Schmidt, provided he used reasonable diligence in adapting and perfecting his invention. It is unnecessary to cite authorities in support of this proposition, so often has it been approved. This is so even though Schmidt had actually or constructively reduced it to practice before him. O'Connell, having first conceived

and disclosed the invention, was under no obligation of diligence until just prior to the date when his rival entered the field. The time to be considered is five months and ten days. There is no hard and fast rule by which to determine the question of due diligence. In other words 'there is no general rule of what constitutes due diligence, that being a question to be determined by all the facts and surrounding circumstances in the particular case.' Let us examine the facts and circumstances in the case before us. O'Connell had conceived the idea, and had embodied it in models which almost amounted to a reduction to practice, and which, had the second one been connected up and tested, would have amounted to a reduction to practice. He had placed the invention before those who, under certain conditions, were entitled to patent it. At the time when his rival entered the field he was urging that the invention be accepted and patented. That was in February, 1902. In April or May of the same year, O'Connell becoming more persistent, the application was, at some time prior to June 19, 1902, prepared, and on that day the oath to the application was executed by him and the application assigned to the Western Electric Company. * * * The application, however, was not filed until a month later. At the most O'Connell's delay after Schmidt entered the field was only a few days over five months, and a month less in having an application for patent prepared and executed, and that application was directed to be prepared a considerable time before. * * * In cases where the facts are as here shown the courts should be slow to deprive the one who first conceives the idea, and so fully discloses it as did this appellant, of a patent because one later to conceive and disclose files his application for patent a short time before him, and while he shows so conclusively that he is not concealing his invention, nor intending to abandon it."

We quote from the brief on behalf of Moore the following comparison between the facts of the instant case and those upon which the Court of Appeals of the District of Columbia based its decision in the O'Connell v. Schmidt case, supra:

"In the Schmidt case * * * O'Connell, the junior party, had made to models. The second model was so complete that it had only to be connected up and tested to have been a reduction to practice. Payne also asserts that there were two models, but both of these were just hydraulic cylinders and pistons, and No. 2 had only a weight on top. They were not connected to an electric furnace; they were not built into the furnace; they had no electrode holder and no electrode, and they were connected so that they were operated by pushing the contacts with one's fingers, rather than by any automatic control.

"Moreover, the models of O'Connell were so complete that the application for patent was prepared from them, and they were so complete that had the inventor O'Connell died, they would have revealed the existence of the invention. In the present case, as we have noted, the models were not attached to or incorporated in any electric furnace. If they were connected to operate on the air-on-oil principle, they were only transiently so connected, and then disassembled. The No. 1 unit, according to Vokac, was always connected up while it was in existence on the air-under-oil system, and it was never reassembled after Payne moved his plant in 1942 to La Grange, Illinois * * *. It was never reassembled at La Grange, consequently had Payne died before his application was filed, it would have taught nothing. The second model, which was similar to the first, was only transiently in existence, and then according to Payne, connected up on June 11 and 12 to operate with the air-on-oil system. The parts were then dismantled and subsequently disposed of by Whiting Corporation * * *, Payne's successor since December, 1943. "Payne's case further distinguishes from O'Connell v. Schmidt in that O'Connell was desperately trying to get his invention adopted, whereas Payne, owning his own Hydroarc Furnace Company, apparently made no attempt to sell any customer on the use of this system until after Moore bid on the American Manganese Steel Company job. O'Connell was trying to get his superiors to file a patent application. Payne, who was the owner of the business, did not try to file any patent

application. O'Connell's patent application was prepared from the models themselves, whereas there is no evidence that Payne's Patent Attorney ever saw the models at all. Payne's own testimony was that in May, 1942 he was afraid of the system and thought he should do more work on the fire hazard problem which, on May 25, 1942, he thought existed * * *.

In the case of O'Connell v. Schmidt, O'Connell was using every effort possible to promote his invention, and the Court held that he was not lacking in diligence in view of all that he did accomplish. In the present case, we have Payne *doing nothing until after he had learned of the activity of his rival.*" (Italics quoted)

It is deemed unnecessary to discuss the case in further detail. The record has been thoroughly studied and the arguments fully considered.

No reason is found for reversal.

The decision of the Board of Interference Examiners * is affirmed.

Affirmed.

Ernest F. Mechlin, Washington, D. C. (George F. Vaia, Washington, D. C. of counsel) for appellant.

E. L. Reynolds, Washington, D. C. (H. S. Miller, Washington, D. C., of counsel) for Commissioner of Patents.

* Throughout the record in this case the board is frequently referred to as the "Board of Patent Interferences." We have used the statutory designation— "Board of Interference Examiners."